Jack ABADJIAN, Mark Ball, Joseph Brown, Ben Ceson, John Eghenian, Brad May, Nassir Mazarei, Donald Prouse, Al Rosenstein, Herb Schweizer, Aram Shishmanian, Joe Smiderle, and Stephen Webber, Plaintiffs,

v.

GULF OIL CORPORATION, a Pennsylvania corporation; Gulf Oil Real Estate Development Corporation, a wholly owned subsidiary of Gulf Oil Corporation; Robert W. Baldwin; J. Roger Kemple; Tom Otjen; Joe Mayers; George Williams; Otto Meyer; Glen R. Jensen, Thrifty Oil Co., a California corporation; and DOES 1 through 100, inclusive, Defendants.

No. CV 83–6686:TJH(Px)

United States District Court, C.D. California.

March 9, 1984.

Kenneth P. Roberts, Mark E. Lehman, Shapiro, Laufer, Krane, Jacobson & Posell, Los Angeles, Cal., for plaintiffs.

Jack D. Fudge, Michael L. Hickok, Ralph Zarefsky, McCutchen, Black, Verleger &

Shea, Los Angeles, Cal., Donald C. Smaltz, Leighton M. Anderson, Thomas H. Mabie, Smaltz & Neelley, Los Angeles, Cal., for defendants.

## MEMORANDUM OPINION

HATTER, District Judge.

This cause of action arises from the decision of Gulf Oil Corporation ("Gulf") to withdraw from the Southern California gasoline market and to sell its service stations in the area to Thrifty Oil Company ("Thrifty"). With the exception of plaintiff Herb Schweizer,[1] each plaintiff occupies and operates a gasoline service station under a lease originally executed with Gulf before June, 1978. Plaintiffs can be classified into two sub-groups according to the marketing plan they have adopted from Gulf. Some of the plaintiffs operate their leased service stations under a single supply agreement with Gulf and market fuel purchased from the company using its trademark, trade name and symbol.[2] The remaining plaintiffs operate "unbranded" service stations pursuant to several continuous supply agreements with Gulf. All these stations were included in the service stations Gulf agreed to sell to Thrifty.

The "unbranded" operators allegedly discontinued their use of Gulf trademarks and symbols on the suggestion of the company. Plaintiffs contend that because Gulf had difficulty competing in the Southern California market it decided to create a debranding program for its independent operators. The first amended complaint alleges that in January, 1978, Gulf called a general operators meeting which several plaintiffs attended. (See First Amended Complaint, ¶ 14.) According to plaintiffs, Gulf announced a new marketing program at this meeting, whereby branded Gulf service station operators would debrand their stations and sell Gulf motor fuel without the benefit of trademarks and logos. (See First Amended Complaint, ¶ 14.) In exchange, Gulf allegedly promised the proposed debranded operators an increased supply of motor fuel at reduced rates, if they agreed to the new marketing plan. *Id.* Consequently, several operators agreed to adopt this plan.

Following the announced debranding program, Gulf prepared to sell its assets in the Southern California market to another oil distributor. In 1979, Gulf initially planned to sell all of its assets located in the Los Angeles Division, which covered the states of Arizona, California, and Nevada, as part of a "package deal." The available package included Gulf's asphalt plants, its Santa Fe Springs Refinery, and more than three hundred service stations, including the stations leased to the plaintiffs. By September, 1980, Gulf had accepted an offer from Thrifty covering the leased service stations (rather than the entire "package deal") and the parties executed a written agreement (the "1980 Letter Agreement") acknowledging the proposed transaction.

After Gulf notified the independent operators about the Thrifty sale, the relationship between Gulf and the independent operators deteriorated. In August 1981, plaintiffs filed their original complaint in state court alleging several violations of state and federal law. Most of the counts in the complaint were premised on state law. The state counts involved claims for fraud, violations of the California Franchise Investment Law, estoppel, unfair competition and requests for declaratory and injunctive relief arising from an alleged conspiracy between Gulf and Thrifty to violate plaintiffs' rights under both state and federal law. Thrifty sought unlawful

---

1. Plaintiff Herb Schweizer was one of several Gulf dealers to whom Gulf offered a right of first refusal to acquire its interest in the service station. Schweizer accepted Gulf's offer and thus has no claim against it for noncompliance with the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.*

2. These plaintiffs are catagorized as "branded dealers." They are identified as Jack Abadjian, Brad May, and Al Rosenstein.

detainer actions against the leases as their new landlord.

The alleged federal question jurisdiction arises from plaintiffs' claim that the September, 1980, sales agreement between Thrifty and Gulf terminated plaintiffs' franchises and obligated Gulf, under the provisions of the Petroleum Marketing Practices Act (the "PMPA"), 15 U.S.C. § 2801 *et seq.*, to offer plaintiffs first refusal rights before closing the Thrifty sale. In opposition, Gulf argues: (1) whether there is a franchise relationship with each plaintiff, and (2) if yes, then the franchise relationship has been assigned to Thrifty as part of the sale of assets transaction. Thus, the defendants claim none of plaintiffs' rights have been violated under the PMPA.

In November, 1981, defendants first petitioned for removal to federal court asserting that the amended state complaint alleged a federal question under the PMPA. However, this Court remanded the entire case to state court for the following reasons. First, the Court found jurisdiction over Thrifty unattainable under the Act since Thrifty is not plaintiffs' franchisor. Secondly, the Court found jurisdiction over the claims against Gulf could not be maintained because it could not sever Gulf's claims from the nonremovable claims against Thrifty. Finally, the Court remanded on the grounds that the Ninth Circuit does not recognize pendent party jurisdiction. *See Aldinger v. Howard*, 513 F.2d 1257 (9th Cir.1975), *aff'd.* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).

Defendants now seek a second opportunity at removal. This most recent removal petition, filed October 17, 1983, contends that plaintiffs' October, 1983, filing of a motion for summary adjudication in state court under the PMPA justifies removal to federal court. At the subsequent removal hearing, the Court requested additional information concerning the merits of defendants' claim that Thrifty is a franchisor as contemplated under the Act. Defendants submit the Santa Fe Springs Refinery Contract ("SFSR Contract"), which assigns Gulf's rights in supply agreements with independent dealer-operators to Thrifty, as proof supporting their renewed claim of federal jurisdiction of the counts relating to Thrifty. Thus, the Court faces a reconsideration of its earlier remand order and addresses the issue of defendant's timeliness in this second removal petition.

### Timeliness of the Present Removal Petition

Plaintiffs are generally considered the masters of their complaints and free to decide the forum in which to bring an action. However, Congress has provided a mechanism for a defendant to gain access to a federal tribunal though the plaintiff brings his action in state court. Under the removal statute, a defendant need only show that the removal petition is timely filed and that a federal court has original jurisdiction over the action. 28 U.S.C. §§ 1446(b) and 1446(a).

Section 1446(b) sets forth a thirty day limitation for filing a petition once a basis for removability exists. Here, plaintiffs assert that defendants second removal petition, filed October 17, 1983, is untimely and should relate back to the filing date for the original complaint, not the date when plaintiffs filed for summary adjudication in state court. Thus, plaintiffs argue this Court lacks jurisdiction over the petition.

However, the statutory time limit for removal petitions is merely a "formal and modal requirement"; it is not jurisdictional. *See Fristoe v. Reynolds Metal Co.*, 615 F.2d 1209, 1212 (9th Cir.1980); 1A *Moore's Federal Practice and Procedure* ¶ 0.168[3.–5] (1974 ed.). Even if the Court adopted the relation back argument, plaintiffs would be estopped from objecting to the timeliness of the removal petition, since defendants' present petition for removal is based on plaintiffs' own October 5, 1983 motion for summary adjudication of actions arising "under PMPA." *Id.* At a minimum, the court may find that plaintiffs most recent summary judgment motion extends the time period for defendants to file a removal petition. Moreover, the plain

language of the removal statute provides that the thirty day period commences after defendants receive "a copy of an amended pleading, *motion*, order or other paper" from which removability can be ascertained. § 1446(b) (emphasis added). Thus, defendants' petition falls within the necessary time limitation.

## Theories for Removability

In a removal action involving multiple defendants, movants can invoke several theories to support federal jurisdiction. They can remove on the grounds that the cause of action arises under federal law, or they can rely on diversity of citizenship, or they can remove under the pendent party theory. 28 U.S.C. § 1441; *See also Aldinger v. Howard*, 513 F.2d 1257 (9th Cir. 1975), *aff'd.*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *Schroeder v. Trans-World Airlines, Inc.*, 702 F.2d 189, 191 (9th Cir.1983). In the present action, diversity and pendent party jurisdiction are unavailable to these defendants. The complaint indicates that several defendants, including Thrifty, are California residents or citizens, thus, complete diversity does not exist as to them. In addition, the Ninth Circuit strongly disapproves of pendent party jurisdiction unless the parties can show an independent ground of jurisdiction exists over the claims against the pendent party. *See, Benson v. U.S. Small Business Administration*, 644 F.2d 1366, 1367 (9th Cir.1981); *Libby, McNeill, and Libby v. City National Bank*, 592 F.2d 504, 510 (9th Cir.1978); *Ayala v. United States*, 550 F.2d 1196 (9th Cir.1977). Therefore, this Court's decision on removability turns on the federal character of the claims against Thrifty.[3]

## The Merits of Federal Jurisdiction in this Case

■ Federal jurisdiction under the PMPA must be decided on the merits be-

cause the jurisdictional issue and substantive issues are so intertwined with the resolution of crucial facts. *Sun Valley Gasoline, Inc. v. Ernst Enterprises, Inc.*, 711 F.2d 138, 139 (9th Cir.1983). In PMPA cases, the Ninth Circuit has instructed the district courts to avoid dismissal for lack of subject matter jurisdiction solely on the face of the pleadings. *Id.* at 139–40. Relying on the *Sun Valley* holding, defendants contend the Ninth Circuit has prohibited jurisdictional fact finding under PMPA without a trial on the merits. Thus, they argue that by asserting a federal claim against Thrifty on the face of their papers plaintiffs have created a jurisdictional issue which must be resolved at trial.

■ This Court does not read the holding of *Sun Valley* as broadly as defendants wish. In ruling on a challenge to subject matter jurisdiction, a district court is ordinarily free to hear evidence regarding jurisdiction before trial, resolving factual disputes where necessary. *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983); *Thornhill Publishing Co. v. General Telephone and Electronics Corp.*, 594 F.2d 730, 733 (9th Cir.1979). Courts *have been careful to distinguish* between the *standards* of jurisdictional analysis *under motions to dismiss and jurisdictional fact finding in summary judgment proceedings. Augustine*, 704 F.2d at 733–34. In *Sun Valley*, the district court dismissed, pursuant to Fed.R.Civ.P. 12(h)(3), ten counts of the complaint that alleged PMPA violations on the grounds defendant noted the absence in the complaint of an allegation regarding defendants ability to use a refiner's trademark, commonly referred to as "branding authority." *Sun Valley*, 711 F.2d at 139. Later, the court of appeals refused to uphold the dismissal of the PMPA claims without specific jurisdictional fact finding by the court under the Act. *Id.* at 141. However, the court of appeals

---

**3.** Since the Court has already determined that the claims against Gulf and Thrifty are inextricably intertwined, removability under 28 U.S.C. § 1441(c) is also unavailable to these defendants. Section 1441(c) provides that a sep-

arate and independent federal claim may be joined with otherwise nonremovable state claims, thereby permitting removal of an entire action to federal court.

left open the district court's ability to resolve PMPA jurisdictional questions in summary judgment proceedings by noting, "[w]e do not exclude the possibility that these claims may be suitable for Rule 56 disposition." *Id.*

In an exemplary pretrial proceeding where the party seeking dismissal prevailed, the court had an opportunity to develop substantial evidence on the interrelated jurisdictional and factual issues under the rigorous standards of Rule 56. *See Thornhill,* 594 F.2d at 735–36 (Sherman Act case in which Ninth Circuit affirmed summary judgment on the issue of interstate commerce under the Act after reviewing deposition testimony and exhibits). Similarly, in the instant case, this Court has had an opportunity to conduct an extensive review of the record and of matters outside the pleadings to resolve the material issues. The parties seeking remand will prevail on the basis of the undisputed material facts and underlying law. However, my decision is limited solely to the questions relating to jurisdiction over the claims against Thrifty.

█ The purpose of PMPA is to establish "minimum Federal Standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the *franchisor or supplier* of such fuel." *Checkrite Petroleum, Inc. v. Amoco Oil Co.,* 678 F.2d 5, 7 (2d Cir.1982), *quoting* S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, *reprinted in* [1978] U.S.Code Cong. & Ad.News 873, 873 (emphasis added). Congress enacted PMPA to protect franchisees from arbitrary or discriminatory termination of their franchises. S.Rep. No. 95–731, *supra* at 874. The Act limits the termination of any franchise except on the specifically enumerated grounds and upon compliance with notice requirements. 15 U.S.C. §§ 2802(a), (b)(1). Crucial elements that extend jurisdiction under the Act are the existence of a franchise relationship and the occurrence of an event within the regulatory scheme of the statute. *See* 15 U.S.C. § 2802.

The status of Gulf as plaintiffs' initial franchisor is undisputed. Both the branded and unbranded dealers operated their stations under supply agreements with Gulf which predated June, 1978. Even the unbranded dealers sold Gulf gasoline under the company's trade name before the new marketing program in 1978. Thus, the branded dealers operate under a franchise agreement described in 15 U.S.C. § 2801(1)(A); the unbranded dealers operate under a franchise within the reach of 15 U.S.C. § 2801(1)(B)(ii)(II). The triggering event for PMPA jurisdiction over these dealers arose when Gulf allegedly terminated the dealers franchises. The claims against Thrifty arises from the same nucleus of facts. Therefore, defendants can properly remove this action only if independent grounds of federal jurisdiction can be established over Thrifty.

The absence of an independent franchise agreement between Thrifty and plaintiffs defeated defendant's first attempt at removal. Defendants now contend that Gulf's assignment under the SFSR contract to Thrifty created a "franchise relationship" between Thrifty and plaintiffs. However, the record lacks any evidence of a subsequent contract between Thrifty and plaintiffs; the record lacks any proof of a marketing plan by Thrifty for plaintiffs; finally, the parties do not mention the existence of any franchise fee imposed upon plaintiffs by Thrifty. All of the above items are essentially components of a franchise agreement. *See e.g.* Cal.Corp.Code § 31005 (West 1977); *See also* 34 Cal. Jur.3d, *Franchise, Distribution, and Dealership Contracts* § 1 (3d ed. 1977).

Moreover, the issue of Thrifty's lack of Gulf trademark rights is undisputed. Thrifty generally asserts that the SFSR contract included "branding authority or trademark rights", but it points to the specific terms of that agreement noting, "Although, in general, 'Gulf indicia' are excluded from the sale under paragraph 2.07 of the SFSR Contract ...." See Thrifty's Supplemental Memorandum In Support of

880

Jurisdiction at 4.[4] This Gulf indicia represents the trademark rights essential to finding a valid franchise relationship. *See* 15 U.S.C. §§ 2801(1)(B)(i) and (2).[5]

In defining the "franchise relationship" under PMPA, the Congress recognized the interrelated nature of the leased premises with the motor fuel supply agreement in petroleum franchises. The Senate noted:

> The franchise relationship in the petroleum industry is unusual, in fact perhaps unique, in that the franchisor commonly not only grants a trademark license, but often controls, and leases to the franchisee, the real estate premises used by the franchisee. In addition, the franchisor almost always is the primary, even exclusive, supplier of the franchisee's principal item: motor fuel.

S.Rep. No. 95–731, 95th Cong., 2d Sess. 17, *reprinted in* 1978 U.S.Code Cong. & Ad. News 873, 875. Thus, it appears at *first glance* that Congress intended PMPA to reach every motor fuel supply agreement where the supplier is the primary source of fuel or the exclusive source. This broad reading of the statute could bring Thrifty within the definition of a franchisor "but for" the limiting language noted further in the legislative history. "The term 'franchise' is defined in terms of a motor fuel trademark license. It should be noted that the term is applicable *only to the use of a trademark* which is owned or controlled by a refiner." *Supra* at 888 (emphasis added).

Although the Ninth Circuit remains silent on whether branding authority is essential to the existence of a franchise relationship under PMPA, see *Sun Valley*, 711 F.2d at 141, most courts favor the express

need for granting trademark use to support a finding of a franchise relationship. *See Lasko v. Consumers Petroleum of Connecticut, Inc.*, 547 F.Supp. 211, 219 (D.Conn.1981) (implying necessity of branding authority), *and Blackwell v. Power Test Corp.*, 540 F.Supp. 802, 807 (D.N.J. 1981) (SAME), *aff'd. mem.*, 688 F.2d 818 (3d Cir.1982). Given the emphasis placed on the use of trademark rights in PMPA cases, only two alternative theories could possibly provide jurisdiction over Thrifty absent branding authority by Gulf. Either the Court must find (1) a valid assignment of the franchise relationship by Gulf to Thrifty, or (2) it must find that Gulf and Thrifty's sales transaction involved a less than arms length deal between the parties. *See Bsales v. Texaco, Inc.*, 516 F.Supp. 655, 661 (D.N.J.1981) (cited for the latter proposition).

■ The legislative history of PMPA allows the assignability of a, petroleum franchise as provided by state law. S.Rep. No. 95–731, *supra* at 901. In the absence of an express agreement, the applicable California statutes "clearly manifest a policy in favor of the free transferability of all types of property, including rights under contracts." *Farmland Irrigation Co. v. Dopplmaier*, 48 Cal.2d 208, 222, 308 P.2d 732, 740 (1957); *See* Cal.Civ.Code § 1458 (West 1982); *see also*, Cal.Comm.Code § 2210 (West 1968).[6] But, a closer analysis of the PMPA legislative history reveals a district court's ability to invoke its equitable powers and preempt state law on assignability to comply with the overall scheme of the Act:

> [T]here is an area in which Federal termination provisions under this legislation

---

**4.** In addition, Barry W. Berkett, Vice President and Assistant Secretary of Thrifty Oil Co., testified through deposition testimony that he was unaware of any of the plaintiffs ever purchasing motor fuel from Thrifty as of December 2, 1983 (Berkett deposition at 16).

**5.** Thrifty has not, as of December 2, 1983, granted any of the plaintiffs the right to utilize the Gulf trademark (Berkett deposition at 36).

**6.** A contract may be nonassignable if the duties imposed upon one party is of such a personal

nature that their performance by someone else would in effect deprive the contracting party of the benefit of its bargain. *See Dopplmaier*, 48 Cal.2d at 222, 308 P.2d at 740. It is possible that a franchise agreement involving trademark rights is such a contract, however, the present decision rests strictly on an interpretation of the federal statute involved in this case leaving questions of franchise agreement assignability to the state court for its resolution.

and state-granted rights of assignability of a franchise may conflict. It is intended that the harmonizing of these competing interests be left to judicial balancing of competing equities on a case-by-case basis. No hard and fast statutory rule would accomplish the desired goal of harmonizing the competing statutory objectives as equitably as application of general principles of equity to specific fact situations.

S.Rep. No. 95–731, *supra* at 901.

■ Under PMPA, a franchisor's withdrawal from a relevant geographic market can amount to a termination of non-renewal of the franchise agreement that triggers both notice and first refusal rights for franchisors. *See* 15 U.S.C. § 2802(b)(2)(E). The undisputed facts indicate that Gulf intended to sell all its assets in the Los Angeles Division and to withdraw from the highly competitive Southern California gasoline market.[7] The subsequent actions taken to sell plaintiffs' leased premises and the Santa Fe Springs Refinery are incidental to Gulf's stated purpose: market withdrawal. For this Court to find that the "package deal" involving Thrifty amounted to an assignment of the "franchise relationship," and not a market withdrawal, would result in the complete circumvention of the Act. Thus, it is my determination view that Thrifty cannot hold the same status as a franchisor to these plaintiffs as held by Gulf. At most, Thrifty may have an assignment of the leased premises under state law if Gulf complied with PMPA in the first instance.

■ As a general rule, a contractual relationship between the individual parties is a precondition for jurisdiction under PMPA. *See Bsales,* 516 F.Supp. at 662 N. 4. However, a second alternative theory for PMPA jurisdiction over a noncontractual third party such as Thrifty involves a judicially recognized, narrow exception to the franchise relationship rule. In *Bsales,* the district court implied in *dicta* that through an "extraordinary situation" a landlord of premises used in a franchise

operation may owe certain duties to the franchisee, even though the landlord is not a franchisor. 516 F.Supp. at 661. The district court noted:

> [I]f the landlord and the franchisor enter into a lease which is *not the product* of arm's length negotiations and that lease expires and is not renewed, then the franchisee may have a cause of action [under PMPA] against both the franchisor and the landlord. Similarly, the absence of an arm's length relationship between the franchisor and the landlord at the time that an option to renew a lease is under consideration might give the franchisee rights against both parties, if the option is not exercised.

*Id.* at 661 (emphasis added).

In *Bsales,* similar to the allegations in this case, plaintiffs alleged a conspiracy existed between the franchisor and the landlord to deprive plaintiffs of their rights under PMPA. The district court did not find a conspiracy between the parties in the absence of "direct and explicit evidence of such a conspiracy." 516 F.Supp. at 662. The court concluded that an inference of a conspiracy could not be made merely by an allegation that the defendants negotiated with their own interest in mind, absent proof that the franchisor exercised control over the new landlord. *Id.* at 662–63. Even a party's negotiating in bad faith is not actionable under this theory. *Id.* at 663 n. 8.

■ The instant plaintiffs argue that defendants conspired to terminate their service station leases and deprive plaintiffs' of their first refusal rights under PMPA. (See First Amended Complaint ¶ 33b.) The only evidence plaintiffs allege establishes a conspiracy between defendants Thrifty and Gulf is the SFSR contract and the September 1980 letter agreement, but the undisputed facts demonstrate these agreements resulted from vigorous negotiations to purchase Gulf's Los Angeles Division assets *after* Gulf decided to withdraw from that market. Although Gulf and Thrifty en-

---

7. See I. Roger Kemple's deposition testimony at 78–79; 99–100.

tered into a sales agreement that included the stations leased by plaintiffs, this Court finds plaintiffs have offered no evidence establishing an intent by either defendant to circumvent the Act. Nor is there any evidence that Gulf in any way controlled Thrifty's actions during their negotiations or anytime afterwards. While the complaint properly alleges, *inter alia*, Gulf failed to comply with the notice, termination, and first refusal rights of plaintiffs as required by PMPA, these allegations are unrelated to any proven conspiracy between Gulf and Thrifty.

## CONCLUSION

Having decided that the claims against Thrifty do not arise under PMPA, the Court no longer has an independent basis of subject matter jurisdiction to entertain plaintiffs state law claims against Thrifty. Limitations on the Court's power to exercise "pendent party" jurisdiction and the interrelatedness of the claims against all the defendants requires this Court to remand the entire case. Thus, the motions of plaintiffs for remand to state court are granted and the Court does not make any further findings.