SOUTHERN NEVADA SHELL DEALERS ASSOCIATION, and Ronald Bird, Lyle Brennan, Boyd Carlson, Don David, Freddie L. Funston, David Goodwin, Harry Harvey, Al Razza, Don L. Valesquez, and Clifford Zimbelman, individually, Plaintiffs,

v.

SHELL OIL COMPANY, a Delaware Corporation; Atlantic Richfield Company, a Delaware Corporation; Arco Petroleum Products Company, a Division of Atlantic Richfield Company, Defendants.

No. CV LV 85–910 RDF.

United States District Court,
D. Nevada.

Dec. 30, 1985.

Norman Ty Hilbrecht, Hilbrecht & Associates, Las Vegas, Nev., Hiram A. deFries, Robert A. Newton, Law Offices of Newton & deFries, Laguna Hills, Cal., for plaintiffs.

William G. Lowerre, George A. Nachtical, Houston, Tex., Monte N. Stewart, Wright, Shinehouse & Stewart, Las Vegas, Nev., for defendant Shell Oil Co.

Donald C. Smaltz, Leighton M. Anderson, Hahn Cazier & Smaltz, Los Angeles, Cal., Thomas F. Kummer, Vargas & Bartlett, Las Vegas, Nev., for defendants Atlantic Richfield Co., and Arco Petroleum Products Co.

## ORDER DENYING APPLICATION FOR PRELIMINARY INJUNCTION

ROGER D. FOLEY, Senior District Judge.

### FACTUAL BACKGROUND

The individual plaintiffs are franchised dealers of motor fuel products for Shell Oil Company in Las Vegas, Nevada. Plaintiff Southern Nevada Shell Dealers Association is an incorporated association consisting of a membership of the individual plaintiffs. Collectively the plaintiffs will be referred to as the dealers. The defendants are Shell Oil Company (Shell) and Atlantic Richfield Company (Arco).

On August 2, 1985, Shell and Arco entered into a property exchange agreement in which Shell agreed to convey to Arco its interest in 15 service station locations in Las Vegas, Nevada in return for Arco's agreement to convey to Shell its interest in 23 service station locations in Chicago, Illinois. By letters dated August 8, 1985, Shell notified its Nevada dealers that it had decided to withdraw from the Southern Nevada market. The letter also stated that prior to September 15, 1985, Arco would offer each of the Shell dealers an opportunity to become an Arco franchisee and that, if the franchise offer were not accepted, the dealer would be required to vacate the location by 10:00 a.m., February 14, 1986.

On or about August 27, 1985, Arco offered each dealer a one year trial franchise, customarily offered to new Arco franchisees. The offer was conditioned upon the lawful termination of the dealer's existing franchise with Shell and the acquisition by Arco from Shell of the station premises by October 30, 1985. The dealers rejected the one year trial franchises. On or about September 12, 1985, Arco attempted to deliver to each dealer a written offer for a three year non-trial franchise. The dealers refused to acknowledge receipt of the three year offers, and each of the dealers who had made appointments to meet with Arco representatives to discuss the offers, cancelled their appointments. Thereafter, Arco mailed the franchise offerings to each of the dealers by certified mail. Half of the dealers refused to accept delivery, from the postal carrier, of the certified mail packages. Although half of the dealers refused delivery of the three year franchise offer, this court finds, from the evidence presented, that each of the dealers were aware of the three year offer.

On October 21, 1985, the plaintiffs brought this action to enjoin Shell and Arco from proceeding with the property exchange and for damages and declaratory relief. The dealers claim Shell and Arco have not complied with the Petroleum Marketing Practices Act and that the dealers are therefore entitled to a preliminary injunction preventing Shell and Arco from proceeding with the property exchange during the pendency of this action.

### ANALYSIS

The Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 et seq., governs the termination or nonrenewal of motor fuel product franchises. The provisions of the PMPA are exclusive and pre-empt all state laws regarding the termination and nonrenewal of a motor fuel product franchise unless such state laws are the same as the applicable provisions of the PMPA.

15 U.S.C. § 2806(a). The court's responsibility in this case is not to determine the desirability or appropriateness of the proposed exchange or to determine whether the exchange is in the best interests of the parties or the people of Nevada. The court's responsibility in this case is to determine whether Shell and Arco complied with the PMPA in connection with the property exchange agreement.

Under the PMPA, a franchisor may withdraw from marketing motor fuel through retail outlets in a specific geographic market area, and thereby terminate existing franchise agreements, if the applicable requirements are complied with.

*Notice*

■ Section 104 of the PMPA requires a franchisor who is withdrawing from the market in a specific geographic area to give 180 days' written notice to each franchisee and the governor of each state in which the franchisor is withdrawing. The notice must contain a statement of intention to terminate the franchise and the reasons therefor. 15 U.S.C. § 2804(c). In this case Shell sent a letter to the governor and to each dealer which stated:

> Shell has made a determination in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic marketing area in which the Location is situated. This determination is a ground for franchise termination pursuant to the provisions of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2802(b)(2)(E).

The dealers claim the notice was defective because the reasons for withdrawal were not described with sufficient specificity. However, "[t]he PMPA requires only that the franchisor articulate with sufficient particularity the basis for the decision not to renew so that the franchisee can determine his rights under the Act." *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1226 (7th Cir.1982). In *Atlantic Richfield Co. v. Brown,* No. 85 C 5131 (N.D.Ill. Oct. 21, 1985) [Available on WESTLAW, DCTU database], a statement of notice with near-ly identical wording as Shell's notice letter in this case was held sufficient under the PMPA. The dealers in this case have failed to show that they were unable to determine their rights under the PMPA from the information provided in the termination notice. Shell's letter to the governor and each dealer therefore satisfied the notice requirements of the PMPA.

*Grounds for Termination*

Congress passed the PMPA in part to protect "franchisees from arbitrary or discriminatory termination or non-renewal of their franchises." At the same time Congress recognized the "importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." S.Rep. No. 731, 95th Cong., 2d Sess. 15, 19, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 873, 874 and 877. In accordance with such policies, the PMPA prohibits termination or nonrenewal of a motor fuel franchise agreement unless such termination or nonrenewal is based upon a ground provided by the Act. 15 U.S.C. § 2802(a), (b)(1). In pertinent part, the Act states, at 15 U.S.C. § 2802(b):

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

. . . . .

(E) [A] determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic marketing area in which the marketing premises are located, if—

. . . . .

(iii) in the case of leased marketing premises—

(I) the franchisor during the 180-day period after notification was given pursuant to section 104 [15 U.S.C. § 2804], either made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises,

or, if applicable, offered the franchisee a right of first refusal of at least 45 days duration of an offer, made by another, to purchase such franchisor's interest in such premises; or

(II) in the case of the sale, transfer, or assignment to another person of the franchisor's interest in such premises in connection with the sale, transfer, or assignment to such other person of the franchisor's interest in one or more other marketing premises, if such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect with respect to which such other person is the franchisor.

### Shell's Good Faith

■ The above provisions allow a franchisor to terminate a franchise if the franchisor has determined in good faith and in the normal course of business to withdraw from the market in a particular geographic area, and if the franchisor complies with the restrictions on the method of disposition as required by subsection (iii). The dealers claim that Shell's decision to withdraw was not made in good faith and was not made in the normal course of business. The dealers contend that Shell has an adequately profitable business in Southern Nevada and that Shell's decision to withdraw was motivated by a desire to circumvent Shell's existing obligations to the dealers and thereby increase its profits. The dealers place great emphasis on the point that Shell's business in Southern Nevada was not unprofitable. However, the PMPA does not require lost profits as a grounds for termination. The legislative history of the PMPA illustrates Congress' intent regarding the meaning of "good faith" and in the "normal course of business." The legislative history states:

This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made "in the normal course of business". Under this test, the determination must have been the result of the franchisor's normal decisionmaking process. These tests provide adequate protection of franchisees from arbitrary and discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself. Thus, it is not necessary for the courts to determine whether a particular marketing strategy, such as a market withdrawal, or the conversion of leased marketing premises to a use other than the sale or distribution of motor fuel, is a wise business decision.

S.Rep. No. 731, 95th Cong., 2d Sess. 37, *reprinted in* 1978 U.S.Code Cong. & Ad. News 873, 896.

■ The affidavit of J. William Schutzenhofer, Shell's vice president of marketing, demonstrates that Shell's decision to withdraw from the Southern Nevada market was not a sham or artifice but was the result of Shell's normal decisionmaking process. The dealers have provided no evidence to establish that Shell's decisionmaking process was a deviation from its established policies and procedures or that the decision was arbitrary or discriminatory. The PMPA reflects an intent to allow franchisors to exercise reasonable business judgments which will not be second guessed by the courts. See *Brach v. Amoco oil Co.*, 677 F.2d 1213, 1220 (7th 1982). Shell's decision to withdraw complies with the applicable provisions of the PMPA.

■ The dealers also claim that Shell has not complied with 15 U.S.C. § 2802(b)(2)(E)(iii)(I). The dealers have cited *Abadjian v. Gulf Oil Co.*, 602 F.Supp. 874 (C.D.Calif. 1984), for the proposition that § 2802(b)(2)(E)(iii)(I) requires Shell to either give the dealers a bona fide offer to purchase Shell's interest in each of the respective service station premises, or a right of first refusal to accept the offer Shell made to Arco. In *Abadjian*, the court said at 881: "Under the PMPA, a franchisor's withdrawal from a relevant geographic market can amount to a termination [or] non-re-

newal of the franchise agreement that triggers both notice and first refusal rights for [franchisees]." However, in *Atlantic Richfield Co. v. Brown*, supra, with respect to the *Abadjian* decision, the court stated:

> The court's oversimplification of the rights accorded a franchisee upon withdrawal by its franchisor from the relevant geographic market can be attributed to the fact that the meaning of section 2802(B)(2)(E) was not before the court. The *Abadjian* court did not hold that the terminated franchisees must be granted rights of first refusal; such a holding would be at odds with the plain language of the PMPA.

*Brown* at 10.

The use of the word "or" between subclauses I and II of § 2802(b)(2)(E)(iii) clearly indicates that a franchisor is not required to proceed under subclause I but may proceed under subclause II at his option. In view of the plain wording of the statute, this court rejects the dicta in *Abadjian* and holds that the PMPA does not require a franchisor to give each franchisee a right of first refusal or a bona fide offer to purchase the franchisor's interest in the premises, if the franchisor otherwise complies with subclause II of § 2802(b)(2)(E)(iii). Because Shell elected to proceed under subclause II the dealers were not entitled to an offer or a right of first refusal.

*Arco's Good Faith*

When a franchisor withdraws from the market in a particular geographic area and sells, transfers or assigns his interest to another person, the franchisor may elect to proceed under subclause II of § 2802(b)(2)(E)(iii). Under subclause II the withdrawal will be allowed if "such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor." The dealers claim that subclause II has not been complied with because on or about August 27, 1985, Arco offered the dealers only a one year trial franchise. The dealers claim the one year trial offer was both made in bad faith and was discriminatory as compared to franchises that Arco offers its existing franchisees.

On or about September 12, 1985, Arco attempted to deliver to each dealer a three year non trial franchise. When the dealers refused to acknowledge receipt of such offers, Arco mailed the offerings by certified mail to each dealer. Shell and Arco claim the three year offers satisfied the requirements of the PMPA. The dealers claim the three year offers were untimely and claim that Arco's bad faith in first offering a one year franchise cannot be cured by the three year offers.

Subclause II of § 2802(b)(2)(E)(iii) does not place a limitation on the time in which a good faith non-discriminatory offer must be made. Because there is no time limitation, this court must conclude that such offer can be made any time prior to the date the franchise is terminated. In this case the date of termination is February 14, 1986. This interpretation of subclause II is consistent with subclause I under which the franchisor could offer to sell his interest in the premises to the franchisee any time during the 180-day period after notice of termination. The dealers claim that Arco was required to make a good faith non-discriminatory offer prior to September 15, 1985, because Shell's notice of termination stated that Arco would offer each dealer an opportunity to become an Arco dealer prior to that date.

The September 15, 1985, date was derived from an agreement between Shell and Arco of which the dealers were not a party. The dealers have not shown that they were damaged by Arco's failure to make the three year offers by September 15. Such a claim would be tenuous in view of the fact that the three year offers were made shortly after September 15, and the delay was caused in part by the dealers' refusal to acknowledge receipt of the offers. The

dealers' rights are derived from the PMPA which places no limitation on the time in which a good faith non-discriminatory offer must be made. Therefore, Arco's three year offer was timely under the PMPA.

The dealers also claim that Arco's one year trial offer was discriminatory as compared to franchise offers Arco gave its existing franchisees, and that because the offer was discriminatory it was made in bad faith. The dealers claim that the PMPA does not allow a franchisor to cure his bad faith and that because the one year offers were made in bad faith the three year offers were also made in bad faith.

This court cannot agree with the dealers' interpretation of the PMPA. The PMPA requires only that Arco make a good faith non-discriminatory offer. Under this court's interpretation of the PMPA, that offer can be made any time prior to the date of termination, regardless of any previous non-conforming offers. Thomas R. Murphy, Arco's region manager in charge of Southern Nevada, stated in his affidavit, that the three year franchise contracts offered to the dealers in this case were identical to Arco's franchise contracts, then in effect with its existing franchisees and that such contracts have been used exclusively by Arco since June 1984. (Murphy's declaration at 6, later converted to an affidavit.) Because Arco's three year franchise offers were not discriminatory, it is not necessary to determine whether the one year franchise offers satisfied the requirements of the PMPA.

With one exception, the dealers do not otherwise challenge the three year offers as being discriminatory. They only state that it is difficult to imagine that the three year offer is comparable to Arco's existing franchises because "[p]resumably, Arco dealers have some negotiating powers and the terms and conditions of their franchise operations are determined at arms length on a case by case basis." (Dealers' reply brief at 5.) However, Thomas R. Murphy states in his supplemental affidavit that "Atlantic Richfield does not negotiate the terms and conditions of its franchise con-

tracts with individual dealers on a case-by-case basis." (Murphy's supplemental Affidavit at 3.) Murphy's affidavit rebuts the dealers' presumption. The dealers do not otherwise challenge the three year offers as being discriminatory and the evidence presented suggests that the three year offers in this case are the same as Arco's agreements with its existing franchisees. Arco's three year offers therefore satisfied the requirements of the PMPA.

■■■ The dealers put considerable emphasis upon the fact that Arco franchises are different from or inferior to their existing Shell franchises. However, this is not a consideration under the PMPA. The PMPA requires only that the franchises offered by Arco not be discriminatory as compared with Arco's existing franchises or franchises currently being offered by Arco. Certain of the dealers also indicate in their depositions that they have not received the three year offers. However, this court finds from the evidence presented that all the dealers know of the three year offers and the reason some of the dealers may not be in possession of their written offer is because of their own refusal to accept delivery of such offer.

### Standard for Granting a Preliminary Injunction

Section 2805(b) provides that a court may grant equitable relief if necessary to remedy the effects of any failure to comply with the PMPA if the franchisee shows: 1) that the franchise has been terminated, 2) that sufficiently serious questions exist going to the merits to make such questions a fair ground for litigation, and 3) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of the injunctive relief will be less than the hardships imposed upon the franchisee if the injunctive relief is not granted.

In this case the parties agree that the notice of termination satisfied the first requirement. It is not necessary to balance the hardships that will or will not be imposed on the parties because the dealers have failed to show that there exists suffi-

ciently serious questions going to the merits to make such questions a fair ground for litigation. Under the PMPA, a franchisor's withdrawal from marketing motor fuel in a specific geographic area is permitted if the franchisor complies with the applicable requirements of the PMPA. Under this court's interpretation of the PMPA, those requirements have been met. Sufficiently serious questions that would be fair grounds for litigation regarding whether Shell and Arco complied with the PMPA do not exist. The dealers are not entitled to a preliminary injunction.

Included with each of Arco's three year franchise offers was a letter from Arco stating that if the dealer were willing to accept the offer, he should execute all copies of the agreement and return them to an Arco representative who would call on the dealer in about 15 days. Because of this litigation, there was no further effort to execute the agreements. Therefore, this court concludes that the three year offers remain open either until the date of termination of the Shell franchises or until Arco gives sufficient notice otherwise.

### ORDER

WHEREFORE, IT IS ORDERED that plaintiff's application for a preliminary injunction is DENIED.